[No. 2484–2.   Division Two.   May 16, 1978.]

RICHARD D. ADAMSKI, *Appellant,* v. TACOMA GENERAL HOSPITAL, ET AL, *Respondents.*

*William J. Rush* and *Rush & Hayes*, for appellant.

*William R. Hickman, Reed, McClure, Moceri & Thonn, Allan R. Billett,* and *Comfort, Dolack, Hansler, Hulscher, Rosenow, Burrows & Billett,* for respondents.

REED, A.C.J.—Plaintiff Richard D. Adamski appeals from a Pierce County Superior Court order which granted the motion of defendant Tacoma General Hospital (Tacoma General) for summary judgment and dismissed plaintiff's medical malpractice action against the hospital. We reverse because we find genuine issues of material fact as to (1) whether the emergency room physician who treated plaintiff was Tacoma General's agent, and (2) whether the hospital's emergency room nurses were negligent in their treatment of plaintiff.

On January 9, 1974, plaintiff injured his finger while playing basketball. According to plaintiff the bone had broken and was protruding from a gash on the palmar surface of the finger. Plaintiff, aided by a friend, forced the bone back into position, applied a crude splint, covered the wound with a makeshift bandage and continued the game. Later that evening he presented himself for treatment at the emergency room of Tacoma General. Plaintiff first explained his injury to an emergency room nurse, who had his finger x-rayed, and then to the physician in charge, Dr. Tsoi. The doctor irrigated, debrided and cleansed the wound with saline solution and the cut was closed completely with nylon sutures and bandaged. Plaintiff was told to consult his personal physician in 5 to 6 days for removal of the stitches, or sooner if swelling should occur. Plaintiff was also given a copy of Tacoma General's form which reads as follows:

TACOMA GENERAL HOSPITAL EMERGENCY CARE
PHYSICIAN:                                    DATE:
INSTRUCTION FOR: Care for Wounds After Suturing

All sutures should be removed in your Doctor's office within 5–6 days unless otherwise advised. For your convenience, call the office for an appointment.

If the wound is bandaged, it should be left as it is. Keep it clean and dry, and changed only by your family Doctor. Your Doctor should be notified at once if you notice any redness, pain, swelling, or excessive fresh blood on the dressing. ·

The Doctors' Exchange, BR 2–3166, may be of help if you cannot locate your Doctor. *If unable to reach him at either his office, home or exchange, feel free to call the Emergency Department.* MA 7–1181, Ext. 184

(Italics ours.)

That evening plaintiff's hand began to swell and was somewhat tender; the next day the swelling had increased and he experienced severe pain. According to plaintiff, he called Tacoma General's emergency room for advice; plaintiff avers he talked with the nurse on duty, who told him that pain and swelling were not an unusual aftermath of his treatment. The next day, January 11, plaintiff avers he again called the hospital and explained to the emergency room nurse that his situation had worsened and that he wished to be seen by the emergency room physician. He claims he was again told his symptoms were not unusual and that he should see his personal physician.

Plaintiff then attempted to contact Dr. R. Marx, an orthopedic specialist with whom he had previously treated. Dr. Marx was not available, however, and his office referred plaintiff to Lakewood General Hospital, where he was examined by its emergency room physician, Dr. North, who tentatively diagnosed a deep infection of the hand and referred him to Dr. Dale Hirz, a private physician. Plaintiff told Dr. Hirz how the injury had been sustained and how he had reduced the fracture so that the bone was not exposed. Based on this history, Dr. Hirz suspected that a staphylococcus infection had entered the joint sheath and determined that immediate treatment was needed to halt

the spread of infection. Plaintiff was admitted to Lakewood General Hospital, placed on antibiotics and the next day, because his condition had not improved, Dr. Hirz surgically opened the little finger; the adjacent ring finger and wrist were also opened to permit a thorough flushing of purulent material from the infected area. The wound on the little finger was left open for drainage—it eventually healed naturally without suturing—and plaintiff was placed on specific antibiotics.

Plaintiff brought this action for damages against Dr. Tsoi, Tacoma Emergency Care Physicians, Inc., P.S. (TECP), a group of physicians who had contracted with Tacoma General, and Tacoma General, alleging as to the latter that (1) Dr. Tsoi was negligent in his diagnosis and treatment, (2) Dr. Tsoi was acting as the hospital's agent, and (3) the hospital's nurse–employees were negligent.

Tacoma General moved for summary judgment in its favor, asserting it could not be held liable for Dr. Tsoi's negligence upon the theory of respondeat superior because the doctor was not acting as its agent (employee–servant). Tacoma General argued the doctor was an independent contractor over whose actions it neither had nor exercised any right of control. In support of its motion Tacoma General filed (1) the affidavit of Dr. Tsoi; (2) the affidavit of Bruce Yeats, its assistant administrator; (3) a copy of the contract between Tacoma General and TECP; and (4) excerpts from Dr. Tsoi's deposition. In his affidavit Dr. Tsoi denied negligence and averred that he had treated plaintiff in accordance with the appropriate standard of care. In his deposition the doctor further stated that the TECP physicians exercised complete control over the emergency room facilities and personnel and the diagnosis and treatment of patients therein.

According to the other supporting documents, on January 1, 1973, the hospital contracted with TECP, a group of five licensed physicians, among them Dr. Tsoi, to furnish emergency room physicians on a 24–hour basis. The contract specifically classifies the emergency room doctors as

"independent contractors" and not "agents or employees" of the hospital. The agreement further provided *inter alia* that (1) Tacoma General alone is to bill patients for the fees of the physicians, who agree to charge going rates; (2) the hospital undertakes to collect from the patient, by suit if necessary; (3) Tacoma General guarantees TECP $10,000 per month; (4) after certain deductions TECP is to be credited with 85 percent of all doctor fees collected, less the $10,000 guaranty; the hospital retains 15 percent for its collection services; (5) the emergency room doctors must be members of Tacoma General's staff and may *not* carry on a private practice in Pierce County, although they are not prohibited from (a) providing emergency room service to other hospitals, (b) assisting private physicians with surgery upon request, (c) teaching medical subjects and (d) providing medical laboratory consulting services; (6) emergency room physicians are precluded from utilizing the emergency room as a "source of private practice"; (7) if TECP desires to furnish a physician other than one of the five named in the contract, Tacoma General's Board must first consent; (8) Tacoma General and TECP will each procure and maintain "professional liability, negligence, errors and omissions, and public liability" policies with limits of $1 million.

On this record, the trial court concluded that Dr. Tsoi was an independent contractor and not an employee of the hospital, and thus refused to hold the hospital liable on a respondeat superior theory. In addition the court found there was no proof Tacoma General's nurses acted negligently. Accordingly, Tacoma General's motion for summary judgment was granted and it was dismissed from the lawsuit.

On appeal we are asked to decide if the trial court should have submitted to the jury (1) the issue of Dr. Tsoi's agency, and (2) the issue of negligence on the part of the nurses. A summary judgment may be granted only when the record before the trial court presents no genuine issues of material fact and entitles the moving party to

judgment as a matter of law. *Morris v. McNicol,* 83 Wn.2d 491, 519 P.2d 7 (1974). In ruling upon a request for summary judgment the trial court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party, *George D. Poe & Co. v. Stadium Way Properties,* 7 Wn. App. 46, 498 P.2d 324 (1972). In determining whether the movant has satisfied his burden of excluding any real doubt as to the existence of any genuine issue of material fact, the movant's papers must be closely scrutinized, while those of the nonmovant should be treated with indulgence. Finally, summary judgment will be denied if there appears to be any reasonable hypothesis under which the nonmoving party may be entitled to the relief sought. *Fleming v. Smith,* 64 Wn.2d 181, 390 P.2d 990 (1964).

Tacoma General relies upon the law as summarized at Annot., *Hospital—Liability—Neglect of Doctor,* 69 A.L.R.2d 307, 315 (1960):

> The general principle that the employer of an independent contractor is not liable for the torts of such contractor or his servants has frequently been recognized with respect to the liability of a hospital for the negligence or malpractice of a physician or surgeon. In other words, putting aside the difficult question whether, under particular circumstances, a particular medical practitioner was an independent contactor so far as the hospital in which a patient was injured through his carelessness is concerned, the conclusion that, assuming such practitioner was an independent contractor in relation to the hospital, the hospital is not liable for such injury, is supported by many decisions.

(Footnote omitted.) *See also* 40 Am. Jur. 2d *Hospitals and Asylums* § 14, at 860 *et seq.* (1968).

We have found no Washington cases addressing the problems inherent in the application of the doctrine of respondeat superior to the hospital–physician relationship. Tacoma General argues that the ordinary rules of agency must be applied and that if this is done, Dr. Tsoi must be held to be an independent contractor for whose negligent

acts the hospital is not responsible. We are referred to the case of *Hollingbery v. Dunn,* 68 Wn.2d 75, 411 P.2d 431 (1966), which adopts the criteria of the Restatement (Second) of Agency § 220 (1958), and holds that the single most important factor to be considered in determining the status of one who performs services for another is the right of the latter to control the former. Tacoma General points out that nowhere in its contract with TECP does it reserve the right to exercise any control over the actual medical treatment rendered to its emergency room patients. Rather, Tacoma General argues, the only contract requirement is that the doctors must be members of Tacoma General's staff and conform to the usual and accepted professional and ethical standards of conduct.

The experience of the courts has been that application of hornbook rules of agency to the hospital–physician relationship usually leads to unrealistic and unsatisfactory results, at least from the standpoint of the injured patient. Consequently, we have seen a substantial body of special law emerging in this area; the result has been an expansion of hospital liability for negligent medical acts committed on its premises.

For many years the majority of courts followed the rule espoused by Tacoma General and held that physicians, because of their skill and training in a highly technical field, were not subject to control by hospital lay boards and thus could not be servants or employees in the sense required by the doctrine of respondeat superior. Rather, physicians were classified as independent contractors with the result that the hospitals in which they labored could not be held vicariously liable for their medical mistakes. In *Schloendorff v. Society of N.Y. Hosp.,* 211 N.Y. 125, 105 N.E. 92 (1914), Justice Cardozo reasoned that hospitals should not be held responsible for the negligent acts of physicians committed on hospital premises because the hospital merely provides the facilities and cannot control the doctors' medical acts. The rationale of *Schloendorff* was followed in many jurisdictions until the decision in *Bing v.*

*Thunig,* 2 N.Y.2d 656, 143 N.E.2d 3, 163 N.Y.S.2d 3 (1957). In a masterful opinion by Judge Fuld, the New York court rejected Cardozo's "professional skill" theory of immunity as being out of step with the times.[1] In essence, the *Bing* court reasoned that other highly skilled professionals were not being excluded from application of the rule of respondeat superior and no valid reason existed for excluding medical practitioners per se. Judge Fuld stressed that hospitals had become more than just a place for physicians to bring their patients for treatment; that, in fact, the hospital itself renders care and treatment through its facilities and employees. In holding the hospital responsible for the negligence of its nurses, Judge Fuld stated at page 666:

> The conception that the hospital does not undertake to treat the patient, does not undertake to act through its doctors and nurses, but undertakes instead simply to procure them to act upon their own responsibility, no longer reflects the fact. Present–day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ *on a salary basis* a large staff of physicians, nurses and internes, as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action. Certainly, the person who avails himself of "hospital facilities" expects that *the hospital will attempt to cure him,* not that its nurses *or other employees* will act on their own responsibility.

(Italics ours.)

---

[1]At the time of the decision in *Schloendorff v. Society of N.Y. Hosp.,* 211 N.Y. 125, 105 N.E. 92 (1914), New York adhered to the doctrine of "charitable immunity" for hospitals. The case was not decided on that basis, however, and the court in discussing general agency principles, concocted both the "professional skill" theory of immunity and the "administrative act–medical act" dichotomy. As Judge Fuld demonstrates in *Bing v. Thunig,* 2 N.Y.2d 656, 143 N.E.2d 3, 163 N.Y.S.2d 3 (1957), the "administrative act–medical act" distinction served only to compound the problem for the courts, *i.e.,* in determining whether an act was medical or administrative. See the cases collected in *Bing v. Thunig, supra. See also* Cunningham, *The Hospital–Physician Relationship: Hospital Responsibility for Malpractice of Physicians,* 50 Wash. L. Rev. 385 (1975).

Once again the majority of courts chose to follow the New York court's lead and embraced the *Bing* concept that, *in certain cases* the doctrine of respondeat superior may serve to render a hospital liable for the negligent acts of the medical personnel who deliver its service to its patients. Since *Bing,* the principal difficulty encountered by the courts has been in determining in which cases to apply the rule of vicarious liability. Application of the traditional right of control test has not solved the problem because the governing body of a hospital never actually exercises, nor can it exercise, much control over a physician's medical decisions and his actual treatment of patients, even when he is clearly an employee of the hospital, such as an intern or resident.

Even before *Schloendorff* and *Bing,* however, the California court, in *Brown v. La Societe Francaise de Bienfaisance Mutuelle,* 138 Cal. 475, 71 P. 516 (1903) applied the doctrine of respondeat superior to the hospital–physician relationship because (1) the patient in the case sought treatment primarily from the hospital, and (2) the hospital paid the doctor a salary. It is on the basis of the "*Brown* formula" that many courts now regularly hold hospitals liable for the negligence of their interns and resident physicians.[2]

Conversely, where the patient contacts his personal physician and is by him admitted to a hospital for treatment, and the doctor looks directly to the patient for his fees, the courts uniformly treat the physician as an independent contractor. Such a holding results in a refusal to impose vicarious liability upon the hospital for the physician's

---

[2]*See, e.g., Garfield Memorial Hosp. v. Marshall,* 204 F.2d 721 (D.C. Cir. 1953); *Bowers v. Olch,* 120 Cal. App. 2d 108, 260 P.2d 997 (1953); *Miami v. Oates,* 152 Fla. 21, 10 So. 2d 721 (1942); *Moeller v. Hauser,* 237 Minn. 368, 54 N.W.2d 639 (1952); *James v. Holder,* 34 App. Div. 2d 632, 309 N.Y.S.2d 385 (1970); *Koubeck v. Fairview Park Hosp.,* 17 Ohio Op. 2d 53, 172 N.E.2d 491 (C.P. 1960); *Sepaugh v. Methodist Hosp.,* 30 Tenn. App. 25, 202 S.W.2d 985 (1946); *Stuart Circle Hosp. Corp. v. Curry,* 173 Va. 136, 3 S.E.2d 153, 124 A.L.R. 176 (1939); *Brant v. Sweet Clinic,* 167 Wash. 166, 8 P.2d 972 (1932).

medical mistakes even though they may occur on hospital premises.[3]

The *Brown* formula does not, however, cover all the possible variations of the hospital–doctor–patient relationship; the most troublesome situation has been that where the patient, not having contacted his personal physician, presents himself at the hospital for treatment and is there provided with or referred to a physician, usually a specialist, who is neither an intern, resident or other salaried employee of the hospital. The courts generally look to all of the facts and circumstances to determine if the hospital and doctor enjoy such a "significant relationship" that the rule of respondeat superior ought to apply. When, in fact, the hospital undertakes to provide medical treatment rather than merely serving as a place for a private physician to administer to his patients, the physician employed to deliver that service for the hospital may be looked upon as an integral part of the total "hospital enterprise."[4] In such cases, it should make no difference that the physician is compensated on some basis other than salary or that he bills his patient directly. These are artificial distinctions, the efficacy of which has long since disappeared and to the perpetuation of which we do not subscribe.

An example of the more enlightened approach is found in *Kober v. Stewart,* 148 Mont. 117, 417 P.2d 476 (1966); in that case, doctors comprising the Billings Clinic contracted to provide Billings Deaconess Hospital with a director for its diagnostic x–ray department. An 80–year–old patient

---

[3]*See, e.g., Mayers v. Litow,* 154 Cal. App. 2d 413, 316 P.2d 351 (1957); *Hundt v. Proctor Community Hosp.,* 5 Ill. App. 3d 987, 284 N.E.2d 676 (1972); *Lundahl v. Rockford Memorial Hosp. Ass'n,* 93 Ill. App. 2d 461, 235 N.E.2d 671 (1968).

[4]The term "significant relationship" is suggested in Cunningham, *The Hospital–Physician Relationship: Hospital Responsibility for Malpractice of Physicians,* 50 Wash. L. Rev. 385 (1975), wherein the author opines that the courts, without saying so, appear to be working toward an "enterprise tort," with the inquiry being addressed solely to whether the tort occurred within the scope of the "hospital enterprise" which is defined as "any service, medical or otherwise, the hospital purports to provide the patient." (50 Wash. L. Rev., *supra* at 418.)

was injured when the radiologist tilted the x–ray table, causing the patient to slide downward, so that he sustained serious leg fractures. The Supreme Court of Montana reversed a summary judgment favoring the hospital, finding there was a genuine issue of fact on the question of agency. Stating that the contract may have been merely the means by which the hospital hired a supervisor for its x–ray department, the *Kober* court fastened upon the following facts as relevant to the issue of agency: (1) neither the patient nor his private physician requested Dr. Stewart's services; (2) the three clinic radiologists rotated their periods of service at the hospital; (3) a hospital employee called Dr. Stewart at home and requested him to come to the hospital and read the x–rays; (4) Dr. Stewart was "on call" for the weekend; (5) the hospital's "standard procedure" was to call the radiologist on duty to read films in serious cases; (6) the hospital owned the equipment, operated the department and charged patients for the total service including doctor fees; (7) the clinic received a percentage of gross receipts.

In *Beeck v. Tucson Gen. Hosp.*, 18 Ariz. App. 165, 500 P.2d 1153 (1972), a summary judgment in favor of the hospital was reversed, the appellate court finding the relationship between the hospital and the physician in charge of its radiology department was that of employer–employee. Even though the doctor and his partner contracted to staff the department and were compensated by a percentage of revenues rather than by salary, the court found a significant relationship between hospital and doctor and applied the doctrine of respondeat superior. In support of its holding, the Arizona court noted the following pertinent facts: (1) the hospital billed for the radiologist's services; (2) the doctors received no other compensation; (3) the doctors agreed generally not to engage in private practice; (4) the doctors were solely responsible for operation of the department; (5) the doctors provided their own insurance coverage; (6) the doctors were to comply with the policies, rules

and regulations of the hospital and the American Osteopathic Association; (7) the contract term was 5 years, terminable upon 120 days' written notice; (8) the hospital owned all the equipment and office supplies and provided the supporting technicians; (9) the patient had no choice in selecting a radiologist, the hospital having made that choice for her. The court noted that the hospital could regulate the manner in which the x–ray equipment was used; it had the right to control the standards of the doctors' performance; the doctor was employed for an extended period of time; and he performed a service which was "an inherent function of the hospital, a function without which the hospital could not properly achieve its purpose." *Beeck v. Tucson Gen. Hosp., supra* at 170. Finally, the fact that Mrs. Beeck had signed a document acknowledging that all those performing services for her, including the radiologist, were independent contractors, and not employees or agents of the hospital, gave the Arizona court little pause: "unless the radiologist were actually an independent contractor the clause reciting him to be so is of no effect." *Beeck v. Tucson Gen. Hosp., supra* at 171.

The *Beeck* court, after reviewing the progress of the law in the hospital–physician field and citing with approval the departure represented by *Bing,* undertook to fashion a statement of policy underlying the extension of liability to a hospital in circumstances such as those before it:

> Having undertaken one of mankind's most critically important and delicate fields of endeavor, concomitantly therewith the hospital must assume the grave responsibility of pursuing this calling with appropriate care. The care and service dispensed through this high trust, however technical, complex and esoteric its character may be, must meet standards of responsibility commensurate with the undertaking to preserve and protect the health and indeed, the very lives of those placed in the hospital's keeping.

*Beeck v. Tucson Gen. Hosp., supra* at 169.

In *Schagrin v. Wilmington Medical Center, Inc.*, 304 A.2d 61 (Del. Super. Ct. 1973), defendant hospital contracted with Doctors For Emergency Services (DFES) to staff its emergency facilities. A 9-year-old child died following allegedly negligent treatment in the emergency room. In finding the existence of a genuine issue as to the fact of agency, thus precluding summary judgment for the hospital, the court relied heavily upon *Bing*, stating as follows at page 64:

> While the New York Court was undoubtedly speaking directly of a situation involving medical personnel who were clearly employees of the hospital, *nevertheless, the rationale of the Court would apply equally to independent contractors performing medical services ordinarily performed by the hospital.* This is particularly pertinent in situations where there has been a holding-out or a representation that medical treatment is to be performed or administered in the hospital by medical personnel employed therein.

(Italics ours.)

The *Schagrin* court appears to fasten on a nondelegable duty to the public which was assumed by the hospital when it, although not required by law to do so, elected to staff and maintain emergency room services as part of its total hospital enterprise.[5]

Turning to the case before us it can readily be seen that the first prong of the *Brown* test is satisfied. Plaintiff went

---

[5]Pursuant to RCW 70.41, the Washington State Board of Health has adopted rules and regulations pertaining *inter alia* to the establishment and maintenance of standards for the care and treatment of patients. The regulations are extensive and comprehensive and, as they apply to emergency services, are contained in WAC 248-18-285. The regulations *require* a licensed hospital to provide emergency care services in accordance with the community's needs and the hospital's capabilities. Within this general framework, however, the hospital is also *required* to adopt written policies and procedures specific to emergency care services. One requirement is that there must be a physician responsible for the services, whose functions and responsibilities are subject to the medical direction of the hospital.

It could thus be argued that Washington State has imposed upon hospitals a duty to provide emergency care services to the public and that they cannot shift the responsibility by contract. This concept was neither developed nor argued at either the trial court level nor in this court on appeal.

directly to the emergency room of Tacoma General and was there given no choice respecting his physician. In fact, Dr. Tsoi had been chosen for him at the time Tacoma General contracted with TECP for emergency room staffing. It is true vis–a–vis the second prong that Dr. Tsoi does not hold a salaried position; rather, except for the guaranty, his group is dependent upon the charges it makes to patients for professional services. There is, however, substantial evidence that Dr. Tsoi was performing "an inherent function of the hospital, a function without which the hospital could not properly achieve its purpose", *Beeck v. Tucson Gen. Hosp., supra* at 170, *i.e.,* he was an integral part of the total hospital function or enterprise. Clearly, when one considers all the facts and circumstances of the relationship between Tacoma General and its emergency room physicians, a substantial and genuine issue arises as to whether that relationship is that of principal and agent. It was error to resolve this issue by summary judgment.

Moreover, where a physician is found not to be the actual agent of the hospital, the latter may still be held responsible for his departures from good medical practice under the so–called "holding out" or "ostensible agent" theory. Restatement (Second) of Agency § 267, at 578 (1958) sets forth the rule as follows:

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

In *Seneris v. Haas,* 45 Cal. 2d 811, 291 P.2d 915, 53 A.L.R.2d 124 (1955), the court reversed a trial court decision sustaining a challenge to the sufficiency of plaintiff's evidence to establish a cause of action against the hospital for negligence of one of its six anesthesiologists. In so doing, the court reiterated the general rule:

Unless the evidence is susceptible of but a single inference, the question of agency is one of fact for the jury. . . .

. . .

Plaintiffs here through the questions permitted them showed that defendant West was one of six anesthetists on defendant hospital's panel, or staff; that he gave anesthetics for no other hospital; that all drugs and equipment used by him were supplied by said hospital; that he had regular "on call" duty at said hospital; that a hospital nurse summoned him to give the anesthetic in question. It appears that this evidence is sufficient to establish, prima facie, that defendant West was an agent of defendant hospital. There is nothing in the record to show that plaintiffs should have been on notice that defendant West was not an employee of defendant hospital and it can not be "seriously contended" that she was obliged to inquire whether each person who attended her in said hospital was an employee or an independent contractor. It follows that the trial court erred in taking the issue of agency from the jury.

(Citations omitted.) *Seneris v. Haas, supra* at 831–32.

In finding evidence of ostensible agency, the *Seneris* court utilized the criteria approved in *Stanhope v. Los Angeles College of Chiropractic*, 54 Cal. App. 2d 141, 128 P.2d 705, 708 (1942), which are:

"[First] The person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one; [second] such belief must be generated by some act or neglect of the principal sought to be charged; [third] and the third person in relying on the agent's apparent authority must not be guilty of negligence.

In *Howard v. Park*, 37 Mich. App. 496, 195 N.W.2d 39 (1972), the defendant clinic referred a little girl patient to an independent doctor for removal of a leg cast using a "vibrating wheel." The patient sustained severe cuts and sought damages from the clinic. The *Howard* court found the clinic liable on ostensible agency grounds. The court noted that (1) treatment took place in the clinic; (2) the clinic chose the physician; and (3) the clinic billed on its

stationery for the physician's charges. The court refused to adopt a requirement that the patient must inquire as to the treating doctor's status in order to entertain a reasonable belief he was the hospital's employee.

In *Vanaman v. Milford Memorial Hosp., Inc.*, 272 A.2d 718 (Del. Super. Ct. 1970), a private physician substituting for the hospital's regular emergency room doctor, negligently applied a leg cast to a 16–year–old girl. The patient did not inquire as to the doctor's status. After noting the doctor was not paid a salary and was not subject to hospital control, the court found evidence of ostensible agency and reversed a summary judgment for the hospital, stating at page 722:

> [I]f it should be found that the Hospital represented that Dr. Graybeal was its servant or other agent in diagnosing and treating plaintiff in its emergency facility, and if it thereby caused her to justifiably rely upon the care or skill of Dr. Graybeal, then it is liable to her for harm caused by any lack of care or skill by Dr. Graybeal just as if he were the Hospital's servant or agent. Restatement, Agency, 2d § 267.

In *Quintal v. Laurel Grove Hosp.*, 62 Cal. 2d 154, 397 P.2d 161, 41 Cal. Rptr. 577 (1964), an anesthesiologist erred during a "routine" eye surgery. The physician was one of a group of specialists who had contracted to staff the hospital's anesthesia department. In holding there was a jury question of ostensible agency, the court stressed that the hospital furnished all equipment and personnel needed to operate the department and that a hospital employee procured from the 6–year–old patient's mother a written "authority to operate."

Finally, in *Schagrin v. Wilmington Medical Center*, *supra*, the court found issues of both actual and ostensible agency even though the hospital had contracted with a group of independent doctors to staff its emergency room facility. As in the case of Mr. Adamski, the patient in *Schagrin* was taken immediately to the emergency room, given no choice of physician, was told to consult her private

physician in 5 to 6 days, but nevertheless sought further emergency room treatment.

Tacoma General argues, however, that there can be no "ostensible agency" or agency by estoppel as it is sometimes called, in the absence of proof of an "affirmative misrepresentation" of Dr. Tsoi's status. The hospital relies for this point on *Greene v. Rothschild,* 60 Wn.2d 508, 374 P.2d 566 (1962), in which the Yellow Cab Company was held to have created apparent or ostensible agents of its former employees who had been converted to driver–owners. Liability was predicated on the fact the cab company permitted use of its "colors, markings and name" and failed to give adequate notice to the public of the new relationship. If Tacoma General's position is that before liability may be imposed, the hospital must have informed the patient he is being treated by its employee, we do not agree. On the contrary, a "holding out" or representation may arise when the hospital acts or omits to act in some way which leads the patient to a reasonable belief he is being treated by the hospital by one of its employees. *Seneris v. Haas, supra; Stanhope v. Los Angeles College of Chiropractic, supra; Quintal v. Laurel Grove Hosp., supra; Schagrin v. Wilmington Medical Center, supra;* Restatement (Second) of Agency § 267.

In the instant case, a jury could find that Tacoma General held itself out as providing emergency care services to the public. A jury could find that plaintiff reasonably believed Dr. Tsoi *was employed by the hospital to deliver that emergency room service.* It appears plaintiff was not advised to the contrary and, in fact, he believed he was being treated by the hospital's agent; in addition, the written instructions provided him after surgery could reasonably be interpreted as an invitation to return for further treatment if plaintiff could not contact his personal physician. The form bearing this instruction also carried the title "Tacoma General Hospital Emergency Care." Clearly, when the facts before the trial court and the fair inferences therefrom are viewed in a light most favorable to plaintiff,

a jury could find that the emergency room personnel were "held out" as employees of the hospital. It was error, therefore, not to submit this issue to the jury.

▮ Finally, we think plaintiff's evidence was sufficient to create a genuine issue of negligence on the part of the hospital's emergency room personnel in failing to provide proper follow–up treatment. Plaintiff's affidavit alleges that emergency room nurses told him his symptoms were not unusual, implying that he needed no further treatment. In addition, the affidavits of Doctors McDowell and Hirz support the reasonable inference that plaintiff's symptoms gave notice of a probable infection which needed immediate attention. It is uncontroverted that plaintiff did have to undergo further treatment because of the infection in his hand. Of course it is for the jury to determine what the nurses told plaintiff in response to his inquiries and whether they gave the proper advice. The hospital's position is, however, that plaintiff, in response to the motion for summary judgment, failed to produce medical testimony to establish the appropriate standard of care, its breach, and that plaintiff's damages were a proximate result of the breach. We do not agree. The hospital, as movant, had the burden of producing evidentiary facts to negate the existence of a genuine issue on these matters. *Reed v. Streib,* 65 Wn.2d 700, 399 P.2d 338 (1965). Except for the denials contained in its pleadings, the hospital put forward no affidavits, depositions, or other proof which would have required the plaintiff to produce his medical evidence. *Cf. Rossiter v. Moore,* 59 Wn.2d 722, 370 P.2d 250 (1962). The decisions in *Swanson v. Brigham,* 18 Wn. App. 647, 571 P.2d 217 (1977) and *Shoberg v. Kelly,* 1 Wn. App. 673, 463 P.2d 280 (1969), are no support for the hospital's position in this regard because in those cases the movants succeeded in producing evidentiary facts sufficient to force a disclosure of plaintiff's medical evidence.

For this and the other reasons we have outlined, summary judgment was an inappropriate method of disposing of plaintiff's claims.

Reversed and remanded for further proceedings consistent with this opinion.

PETRIE and SOULE, JJ., concur.