**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
APRIL11, 2024

_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
APRIL 11, 2024

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

THE ESTATE OF CINDY ESSEX, by and through JUDY ESSEX, as Personal Representative of the ESTATE OF CINDY ESSEX,

Petitioners,

v.

GRANT COUNTY PUBLIC HOSPITAL DISTRICT NO. 1, d/b/a SAMARITAN HEALTHCARE, a Public Hospital

Respondent,

DR. IRENE W. CRUITE, MD, and JOHN DOE CRUITE, husband and wife, and the marital community composed thereof; CONFLUENCE HEALTH, a Washington Corporation; WENATCHEE EMERGENCY PHYSICIANS, PC, a Washington Corporation; DR. CHRISTOPHER DAVIS, MD, and JANE DOE DAVIS, husband and wife, and the marital community composed thereof; and JOHN and JANE DOES 1-10,

Defendants.

No. 101745-6

En Banc

Filed: April 11, 2024

GONZÁLEZ, C.J. — A patient who goes to the emergency room, if conscious, is mostly concerned with getting care, not with untangling the contractual relationship between the hospital and the doctors who work there. And yet the characterization of the hospital-doctor relationship has profound implications for a patient's ability to recover against the hospital for negligent treatment. This case asks us to decide when a hospital may be liable for the negligence of a doctor working in, but not as an employee of, a hospital in its emergency room.

Cindy Essex[1] went to Samaritan Hospital's emergency room because she was experiencing unbearable pain in her left shoulder. Doctors working at, but not as employees of, Samaritan failed to diagnose Cindy's necrotizing fasciitis, an aggressive soft-tissue infection. Cindy died less than 24 hours later. Her estate seeks to hold Samaritan liable for the doctors' alleged negligence under theories of nondelegable duty, inherent function, and agency law principles of delegation.

We conclude that our statutes and regulations impose nondelegable duties on hospitals concerning the provision of emergency services. A hospital remains responsible for those nondelegable duties regardless of whether it performs those duties through its own staff or contracts with doctors who are independent

---

[1] We use Cindy Essex's first name for clarity. We intend no disrespect.

contractors to do so. Accordingly, we reverse the Court of Appeals and remand for further proceedings consistent with this opinion.

FACTS

Cindy Essex went to Samaritan Hospital's emergency room complaining of unbearable pain in her left shoulder and chest that radiated to her abdomen. When Cindy arrived at the emergency room, she was incoherent and experiencing a pain level of 10 out of 10. As a result, her mother, Judy Essex, checked Cindy in and signed the treatment consent form.[2] Cindy continued to writhe and cry out in pain. Nurses moved Cindy to a quiet room to wait for a doctor.

Shortly after arriving, nurses triaged Cindy. About an hour later, Dr. Christopher Davis, an independent contractor, evaluated Cindy. Cindy reported increasing left shoulder pain, blood in her stool, vomiting, and a fever. Dr. Davis ordered pain medication, and Cindy's reported pain level subsequently decreased to 7 out of 10.

Dr. Davis ordered x-rays and a CT (computerized tomography) scan to keep his "diagnostic net fairly wide." Clerk's Papers (CP) at 987. The x-rays showed "a large gastric air bubble" in Cindy's abdomen. CP at 519. A CT scan showed a

---

[2] The form said that patients "must look fully to the attending physician(s) for interpretation of the results of any diagnostic procedure or test and medical and surgical treatment." Clerk's Papers at 502. It also said that the doctors on staff "may be employees or agents of the hospital or, are independent contractors who have been granted the privilege of using its facilities for the care and treatment of their patients." *Id.*

"[m]arkedly distended stomach" with "fluid, suspicious for gastric outlet obstruction although no cause for obstruction [was] identified." *Id.* Relying on the x-rays and CT scan, Dr. Davis diagnosed Cindy with gastric outlet obstruction and ordered a nasogastric tube as recommended by Dr. Irene Cruite. Dr. Cruite was the radiologist responsible for interpreting Cindy's scans. Like Dr. Davis, Dr. Cruite was an independent contractor, not a Samaritan employee.

Cindy reported feeling better following the insertion of the nasogastric tube. Dr. Davis consulted with a gastroenterologist about the cause of Cindy's gastric outlet obstruction. Dr. Davis transferred Cindy to Central Washington Hospital at the recommendation of the gastroenterologist.

While waiting to be transferred, Cindy's pain returned to a level of 10 out of 10. Nurses administered pain medication, but it does not appear that they told Dr. Davis about Cindy's recurring pain. Almost five hours after she arrived at Samaritan's emergency room, a nurse reported bruising on Cindy's upper arms for the first time. It does not appear that this bruising was reported to Dr. Davis.

Cindy arrived at Central Washington Hospital just after 10:00 p.m. Cindy continued to suffer extreme lower back and abdomen pain. Nurses noted redness on Cindy's inner arm and chest. This redness darkened, and nurses noted new raised areas on Cindy's skin. Dr. Stephen Wiest took over Cindy's care. Dr. Wiest reviewed Cindy's CT scans from Samaritan and identified "some soft-tissue skin

changes" that Dr. Cruite previously failed to recognize and report. CP at 543. Dr. Wiest ordered further laboratory testing that indicated elevated inflammation. Concerned by "the possibility of necrotizing fasciitis," Dr. Weist ordered an additional CT scan that "showed worsening soft-tissue swelling." *Id.* Dr. Weist called for examination by a surgeon.

A surgeon arrived and evaluated Cindy. Doctors discovered the extent of Cindy's necrotizing fasciitis while attempting debridement, the removal of dead, infected, or damaged tissue. Doctors concluded that her condition was ultimately "nonsurvivable." CP at 243, 249. Dr. Weist moved Cindy to comfort care where she later died.

Cindy's mother, serving as the personal representative of the estate of Cindy Essex (Essex), brought a medical negligence and wrongful death claim against Samaritan, Dr. Davis, and Dr. Cruite, among others. Essex asserted that the defendants owed Cindy a duty of care, that they breached that duty, and that Cindy died as a result of that breach. Essex also claimed that Samaritan was liable under a theory of corporate negligence.

After extensive discovery including expert declarations and depositions, Essex moved for partial summary judgment concerning Samaritan's potential vicarious liability for Dr. Davis's and Dr. Cruite's alleged negligence. Essex argued that Samaritan was liable under several legal theories including, in part, (1)

nondelegable duty, (2) inherent function, and (3) delegation.[3] The trial court denied Essex's motion.

Samaritan successfully sought summary judgment concerning Essex's (1) corporate negligence claim and (2) vicarious liability claim concerning the acts of Samaritan's nurses. The trial court certified its orders to the Court of Appeals under RAP 2.3(b)(4).

The Court of Appeals concluded, in part, that "(1) ostensible agency is the sole basis for holding a hospital vicariously liable for the negligence of nonemployee physicians" and (2) summary judgment was appropriate concerning Essex's corporate negligence claim against Samaritan. *Est. of Essex v. Grant County Pub. Hosp. Dist. No. 1*, 25 Wn. App. 2d 272, 274, 523 P.3d 242 (2023).

We granted review.

ANALYSIS

The hospital-doctor-patient relationship is ever evolving. Before the 20th century, doctors generally provided health care through house calls. Laura D. Hermer, *The Scapegoat: EMTALA and Emergency Department Overcrowding*, 14 J.L. & POL'Y 695, 702 (2006) (citing PAUL STARR, THE SOCIAL TRANSFORMATION OF AMERICAN MEDICINE 68-71 (1982)). As the quality of modern medicine

---

[3] Essex argued that Samaritan was also liable under theories of ostensible agency and acting in concert; however, those arguments are not before this court.

increased, the prevalence of house calls decreased. *Id.* Instead, patients traveled to their doctors' private offices. *Id.* Meanwhile, with advancements in surgical care, the need for hospitals grew. *Id.* at 703. Hospitals extended admitting privileges to doctors, which allowed them to use the hospital's facilities. Patients needing more complex care could meet their own doctor at the hospital for treatment.

Modern hospitals "'do far more than furnish facilities for treatment.'" *Adamski v. Tacoma Gen. Hosp.*, 20 Wn. App. 98, 106, 579 P.2d 970 (1978) (quoting *Bing v. Thunig*, 2 N.Y.2d 656, 666, 143 N.E.2d 3, 163 N.Y.S.2d 3 (1957)). As in this case, a patient can go to a hospital emergency room without contacting their personal doctor and be treated by a nonemployee physician. *See Adamski*, 20 Wn. App. at 108. The relevant common law, of course, developed before current conditions existed. As so often happens, we must decide how those common law principles apply to these new conditions.

The main question before us is whether ostensible agency is the only theory under which a hospital can be vicariously liable for the negligence of nonemployee doctors providing emergency services. *See Essex*, 25 Wn. App. 2d at 274. Essex contends that in addition to ostensible agency, a hospital can be liable based on (1) breach of a nondelegable duty, (2) negligent performance of an inherent function, and (3) delegation under agency law.

This case is here on review of summary judgment. Our review is de novo. *Bass v. City of Edmonds*, 199 Wn.2d 403, 408, 508 P.3d 172 (2022). Summary judgment is appropriate where there is no genuine dispute as to any material question of fact and where the moving party is entitled to judgment as a matter of law. CR 56(c).

1. *Nondelegable Duty*

Essex argues that hospital licensing statutes and regulations create a nondelegable duty to emergency room patients. We agree.

Generally, an entity is not liable for the injuries caused by an independent contractor whose services are engaged by the entity. *Stout v. Warren*, 176 Wn.2d 263, 269, 290 P.3d 972 (2012) (citing *Hickle v. Whitney Farms, Inc.*, 107 Wn. App. 934, 937, 29 P.3d 50 (2001)). However, where an entity has a nondelegable duty, it cannot avoid liability simply by delegating its duty to an independent contractor. Instead, an entity will be vicariously liable for the independent contractor's negligent performance of that duty absent special circumstances not present here. *Millican v. N.A. Degerstrom, Inc.*, 177 Wn. App. 881, 896, 313 P.3d 1215 (2013) (quoting RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 57 cmt. b (AM. L. INST. 2012)); *Knutson v. Macy's W. Stores, Inc.*, 1 Wn. App. 2d 543, 547, 406 P.3d 683 (2017); *see also Eylander v.*

*Prologis Targeted U.S. Logistics Fund, LP*, 2 Wn.3d 401, 539 P.3d 376 (2023) (outlining one such circumstance).

Statutes and regulations can establish nondelegable duties. *See Tauscher v. Puget Sound Power & Light Co.*, 96 Wn.2d 274, 283-85, 635 P.2d 426 (1981) (explaining that a statute can "create the nondelegable duty of providing safeguards or precautions for the safety of 'others'"). In *Adamski*, the Court of Appeals observed that then existing regulations might[4] impose a nondelegable duty on hospitals concerning their provision of emergency care services to the public. 20 Wn. App. at 111 n.5 (citing former WAC 248-18-285 (1975)). Those regulations required hospitals to provide emergency care in accordance with the community's needs and to adopt policies specific to the provision of that care. Former WAC 248-18-285. The regulations also required hospitals to retain a doctor who was responsible for emergency services and subject to the hospital's medical direction. *Id.*

Samaritan argues that *Adamski* is inapplicable because the regulations the court relied on in that case have since been amended. But while the regulations have been amended, the principles still apply. As in *Adamski*, our current statutory

---

[4] Although the *Adamski* court recognized the possible applicability of the nondelegable duty theory, the issue was not before the court. 20 Wn. App. at 111 n.5.

and regulatory scheme imposes a nondelegable duty concerning a hospital's provision of emergency services.

Chapter 70.41 RCW governs hospital licensing and regulation. Its primary purpose "is to promote safe and adequate care of individuals in hospitals through the development, establishment and enforcement of minimum hospital standards for maintenance and operation." RCW 70.41.010. The Department of Health (Department) is responsible, in part, for effectuating that purpose. *Id.* Accordingly, the Department must establish minimum standards and rules concerning the operation of hospitals. RCW 70.41.030. The Department must amend or modify those rules as is necessary to maintain "standards of hospitalization required for the safe and adequate care and treatment of patients." *Id.*

In response to chapter 70.41 RCW, the Department adopted regulations to "establish minimum health and safety requirements for the licensing, inspection, operation, maintenance, and construction of hospitals." WAC 246-320-001. As a result, the Department regulates hospital leadership and its role in assuring that care is provided "according to patient and community needs." WAC 246-320-136. Regulations require hospital leaders to (1) appoint an executive level nurse to "[a]pprove patient care policies, nursing practices and procedures," (2) establish hospital-wide patient care services, including standardizing processes concerning

the performance of patient care, (3) adopt policies and procedures that define standards of care for specialty services, (4) provide practitioner oversight for specialty services, including emergency services, (5) provide "all patients access to safe and appropriate care," (6) adopt policies addressing nursing practices and patient care, and (7) "[r]equire that individuals conducting business in the hospital comply with hospital policies and procedures." WAC 246-320-136(1)(b), (2)(c), (3)-(7).

In addition to regulating hospital leadership broadly, the Department specifically regulates "the management and care of patients receiving emergency services." WAC 246-320-281. A hospital does not need to provide emergency services in order to be licensed. *Id.* However, once a hospital undertakes to provide emergency services, it is subject to regulation and must

> (2) Maintain the capacity to perform emergency triage and medical screening exam twenty-four hours per day;
> (3) Define the qualifications and oversight of staff delivering emergency care services;
> (4) Use hospital policies and procedures which define standards of care;
> . . . .
> (8) Assure emergency equipment, supplies and services necessary to meet the needs of presenting patients are immediately available.

WAC 246-320-281.

When read together, these regulations impose a nondelegable duty on hospitals providing emergency services. Our current regulations provide for

hospital oversight that is substantially similar to the hospital oversight required by the regulations identified in *Adamski*. *Compare* WAC 246-320-281, *with* former WAC 248-18-285; *Adamski*, 20 Wn. App. at 111 n.5.

Hospitals must provide "all patients access to safe and appropriate care" and are required to establish policies concerning standards of care, nursing practices, and staff oversight. WAC 246-320-136(3)-(6), -281(3)-(4). We conclude that WAC 246-320-136 and WAC 246-320-281 create a nondelegable duty for hospitals providing emergency care services through nonemployee doctors. Although hospitals may delegate the performance of this duty to nonemployee doctors, the ultimate duty—and thus the potential vicarious liability for the failure to meet that duty—remains with the hospital.

2.      *Other Theories of Vicarious Liability*

Essex also argues that Samaritan is liable under agency law principles of delegation. Samaritan responds, correctly, that Washington courts have not applied that theory in these circumstances. On this record and briefing, we decline to reach this question today and will await a case that more squarely addresses the interplay between the nondelegation theory we embrace today, ostensible agency, and this agency theory.

Essex further argues that *Adamski*, 20 Wn. App. 98, establishes inherent function as an independent basis for vicarious liability. We conclude that inherent

12

function is not an independent basis of liability, but that it may be relevant to determining what actions are nondelegable.

*Adamski* turned on whether a jury should have decided whether an independent contractor doctor was an agent of a hospital.  The *Adamski* court did not go so far as to establish inherent function as an independent basis of liability.  Instead, the court considered the performance of an inherent function as one factor in analyzing the hospital-doctor relationship.  *Adamski*, 20 Wn. App. at 112.  Similarly, we recognize that the performance of an inherent function may be a relevant factor in determining whether a duty may be delegated, but given the record and briefing before us, we will await a case that more directly addresses that question.

3.    *Corporate Negligence*

The trial court dismissed Essex's corporate negligence claim finding that as a matter of law, a trier of fact could not find that Samaritan's corporate negligence was the proximate cause of Cindy's death.[5]  Essex argues that it provided sufficient evidence that, if believed by the trier of fact, would establish Samaritan's negligence in training and supervising its nurses was a proximate cause of Cindy's

---

[5] In its complaint, Essex contends that Samaritan breached its corporate duties by failing to (1) hire and retain competent staff, (2) ensure oversight of its staff, (3) accurately diagnose and care for Essex, and (4) develop, adopt, and enforce necessary policies.  CP at 24.  Essex argues that Samaritan is liable for breaching its duty to retain, train, and supervise its emergency department staff.  CP at 889.

death. Samaritan contends Essex cannot show that Dr. Davis's treatment would have been different had he received information concerning Cindy's condition from her nurses. We find sufficient evidence to survive summary judgment on this theory.

Corporate negligence is a sustainable legal theory in Washington. A successful negligence claim requires (1) the existence of a duty owed to the complaining party, (2) a breach of that duty, (3) a resulting injury, and (4) proximate cause between the breach and the injury. *Pedroza v. Bryant*, 101 Wn.2d 226, 228, 677 P.2d 166 (1984) (citing *Hansen v. Wash. Nat. Gas Co.*, 95 Wn.2d 773, 776, 632 P.2d 504 (1981)).

RCW 7.70.040 sets out the elements of medical malpractice. In medical negligence cases an injured individual must prove that

> (a) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which [they] belong[] . . . acting in the same or similar circumstances;
> (b) Such failure was a proximate cause of the injury complained of.

RCW 7.70.040(1). The standard of care for a hospital "is that of an average, competent health care facility acting in the same or similar circumstances." *Ripley v. Lanzer*, 152 Wn. App. 296, 324, 215 P.3d 1020 (2009) (citing *Pedroza*, 101 Wn.2d at 233).

Proving "proximate cause" requires "'first, a showing that the breach of duty was a cause in fact of the injury, and, second, a showing that as a matter of law liability should attach.'" *Mohr v. Grantham*, 172 Wn.2d 844, 850, 262 P.3d 490 (2011) (quoting *Harbeson v. Parke-Davis, Inc.*, 98 Wn.2d 460, 475-76, 656 P.2d 483 (1983)). "Expert testimony usually is required to establish proximate cause in medical malpractice cases." *Douglas v. Freeman*, 117 Wn.2d 242, 252, 814 P.2d 1160 (1991) (citing *McLaughlin v. Cooke*, 112 Wn.2d 829, 837, 774 P.2d 1171 (1989)).

The doctrine of corporate negligence "imposes on [a] hospital a nondelegable duty owed directly to the patient, regardless of the details of the doctor-hospital relationship." *Pedroza*, 101 Wn.2d at 229. Accordingly, a hospital's liability under a theory of corporate negligence is separate from its vicarious liability under the nondelegable duty doctrine.

We first adopted the corporate negligence doctrine in *Pedroza*, 101 Wn.2d at 233. We "adopted the doctrine . . . to address negligence beyond that of the physician, to recognize the onus on the hospital itself for the competency of the hospital's medical staff." *Taylor v. Intuitive Surgical, Inc.*, 187 Wn.2d 743, 756, 389 P.3d 517 (2017) (citing *Pedroza*, 101 Wn.2d at 231-33). We observed that the role of hospitals in our communities is changing. *Pedroza*, 101 Wn.2d at 231. Hospitals serve as "'comprehensive health center[s] ultimately responsible for

arranging and co-ordinating total health care.'" *Id.* (quoting Arthur F. Southwick, *The Hospital as an Institution—Expanding Responsibilities Change Its Relationship with the Staff Physician*, 9 CAL. W. L. REV. 429 (1973)). We adopted the corporate negligence doctrine in response to the public's increased reliance on hospitals. *Id.*

Samaritan argues that Washington law does not recognize Essex's "mutated" corporate negligence theory. Resp't Grant County Pub. Hosp. Dist. No. 1 D/B/A Samaritan Healthcare's Resp. Br. at 58-59 (Wash. Ct. App. No. 37804-7-III (2022)). Samaritan appears to argue that case law limits corporate negligence to issues concerning (1) incompetent staff, (2) granting privileges to doctors, (3) furnishing hospital supplies and equipment, and (4) hospital intervention in the event of negligent doctor care. *Id.* at 60-62.

Samaritan's argument is inconsistent with our pattern jury instructions concerning corporate negligence. 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 105.02.02, at 606 (7th ed. 2019) (providing four examples of duties that hospitals owe its patients but allowing counsel to argue the existence of any duty "the court finds legally applies and is supported by the evidence"). We recognize that our pattern jury instructions are not binding, and we decline to cabin corporate negligence to the limited circumstances

Samaritan identifies. *See State v. Stein*, 144 Wn.2d 236, 246-48, 27 P.3d 184 (2001) (rejecting pattern jury instructions as inaccurate).

Next, we must determine whether Essex presented sufficient evidence to survive summary judgment. Summary judgment is appropriate only if, in considering all of the facts and reasonable inferences in the light most favorable to the nonmoving party, there are no genuine issues of material fact. *Schoening v. Grays Harbor Cmty. Hosp.*, 40 Wn. App. 331, 335, 698 P.2d 593 (1985) (citing *Wendle v. Farrow*, 102 Wn.2d 380, 686 P.2d 480 (1984)). As the nonmoving party, Essex had to present some evidence that Samaritan's negligence in retaining, training, and overseeing its nurses proximately caused Cindy's death. Essex satisfied that burden.

Essex provided several expert declarations and transcripts of depositions concerning Samaritan's training and oversight of its nurses and the causal relationship between that oversight and Cindy's death. An emergency nurse, Amy Curley, provided expert analysis concerning the emergency room nurses' standard of care. Curley explained that "there was a delay in recognizing the severity of illness in this" case. CP at 329. Curley emphasized the nurses' failures to (1) take Cindy's complete vitals, (2) appropriately document Cindy's symptoms, and (3) recognize signs of sepsis. Curley concluded that the nurses' treatment of Cindy fell below the standard of care for registered nurses and that their failings

"contributed to the delay in diagnosis and treatment." CP at 334. Curley concluded that the nurses lacked training and that Samaritan "was negligent in respect to its core training policies and oversight function in respect to the emergency department." CP at 927. Curley opined that had the nurses received appropriate training, Cindy "would have been afforded the opportunity to be alive today." CP at 932.

Dr. Thomas Cumbo analyzed Samaritan's standard of care and oversight of its nursing staff. Dr. Cumbo took the position that "the hospital was negligent with respect to the oversight, training and enforcement" of policies related to its nurses and that "that was a cause of the delay which ultimately led to [Cindy's] death." CP at 981. Dr. Cumbo expressed his concern that Samaritan did not have a way to ensure its nurses were adequately trained to recognize and respond to Cindy's symptoms. Dr. Cumbo explained that nurses did not timely recognize and report Cindy's worsening condition "despite fairly obvious signs and symptoms." CP at 907. The nurses failed to report Cindy's symptoms "in the context of her worsening pain," preventing doctors from fully evaluating her symptoms. CP at 980. Dr. Cumbo concluded that had Cindy's symptoms been "caught sooner debridement probably would have saved [Cindy's] life." CP at 965. Ultimately, Dr. Cumbo agreed that (1) the hospital was negligent in its oversight and training

of its nurses and (2) that that negligence "was a cause of the delay [that] ultimately led to [Cindy's] death." CP at 981.

In light of Essex's expert testimony, we conclude that there is sufficient evidence concerning Samaritan's negligence in training and overseeing its nurses to survive summary judgment. We reverse the trial court's summary judgment order on this issue.

CONCLUSION

Where a hospital elects to provide emergency services, our statutes and regulations create a nondelegable duty concerning the provision of those services. Doctors perform an inherent function of the hospital in carrying out that duty. Thus, we conclude that a hospital cannot escape liability for the negligent provision of emergency services by delegating that duty to its nonemployee doctors. Furthermore, we conclude that Essex provided evidence sufficient to survive summary judgment concerning its corporate negligence claim.

Accordingly, we reverse the Court of Appeals and remand to the trial court for further proceedings consistent with this opinion.

_____
Gonzzález, C.J.

WE CONCUR:

_____   _____
Johnson, J.                       Gordon McCloud, J.

_____   _____
Madsen, J.                        Yu, J.

_____   _____
Owens, J.                         Montoya-Lewis, J.

_____   _____
Stephens, J.                      Whitener, J.